## Case No. 16,700.

### UNITED STATES v. The WILLIAM.

[2 Hall, Law J. 255.]

District Court, D. Massachusetts. Sept. Term, 1808.

CONSTITUTIONAL LAW—LEGISLATIVE AND JUDICIAL POWERS—EMBARGO LAWS.

[1. It seems that the judicial authority of the federal courts is precisely limited in regard to deciding on the validity of legislative acts, and that the power to declare them void exists only in cases of contravention, opposition, or repugnancy to some express restriction or provision in the constitution.]

[2. Before a court can determine whether a given act of congress, bearing relation to a power with which it is vested, be a legitimate exercise of the power or transcend it, the degree of legislative discretion admissible in the case must first be determined. Whether, therefore, it be within the judicial power to declare an act invalid merely on the ground that congress has transcended or exceeded a power with which it is vested by the constitution, quære.]

[3. The constitutional power of congress to regulate commercial intercourse. qualified by the limitations and restrictions expressed in the constitution and by the treaty making power of the president and senate, is sovereign, and may be used not only for the advancement of commerce, but for the promotion of other objects of national concern.]

[4. The embargo laws of December 22, 1807, and March 12, 1808. are not unconstitutional, either on the ground that they exceed the powers of congress to "regulate," because they interdict all foreign commerce. or because they are not by their terms limited to a specific duration.]

In admiralty.

DAVIS, District Judge. This libel is founded on the act of congress, passed 22d December, 1807 [2 Stat. 451], intitled, "An act laying an embargo on all ships and vessels in the ports and harbors of the United States," and on the. first supplementary act, passed January 9th, 1808 [Id. 453]. The libel alleges, that sundry enumerated goods, wares and merchandize, on the 17th day of March last, on the high seas, were put, from said brigantine, on board another vessel, called the Nancy; and also, that other goods, wares and merchandize, on the 11th day of May last, at Lynn, in said district, were put. from said brigantine, on board another vessel, call-

ed the Mary, with intent, that said goods, wares and merchandize should be transported to some foreign port or place, contrary to the acts aforesaid, by which, it is alleged, that said brigantine is forfeited.

It has been contended, by the counsel for the claimants, Benj. Ireson and others: 1st. That the facts, appearing in evidence, do not present a case, within the true intent and meaning of the acts aforesaid. 2d. That the acts, on which a forfeiture is claimed, are unconstitutional. After argument, on these heads, it is suggested, by the counsel for the claimants, that the case may receive material elucidations from the facts that will appear, on the trial of the brigantine Nancy; and they pray for a postponement of a decision on this libel, until a hearing shall be had, relative to that vessel. As that case is necessarily continued, and as that of the Sukey, also pending at this term, appears to have connexion with the transactions in the case of the William, I shall not make up a judgment relative to the facts on this libel, until those of the Nancy and Sukey shall have been tried, or until the further evidence suggested, shall have been heard. But it appears to be necessary to declare an opinion on the constitutional question, which has been so fully discussed, especially as the objection, if available, equally applies to many other cases before the court. Under these circumstances, I have considered it expedient, and indeed an incumbent duty, to give an opinion on this great and interesting question; though an entire decision on the case, in which it was presented and argued, is, for the reasons suggested, postponed.

In considering the several acts, relative to the embargo, as one system, it may be convenient to exhibit an analysis of their contents. The general, or primary, provisions are contained in the first act, passed December 22, 1807, which lays "an embargo on all ships and vessels in the ports and places, within the limits and jurisdiction of the United States, cleared or not cleared, bound to any foreign port or place;" and in the fourth section of the third additional act, passed March 12th, 1808, which prohibits the exportation, from the United States, in any manner whatever, either by land or water, of any goods, wares or merchandise, of foreign, or domestic, growth or manufacture. To the same head belongs the prohibition of the exportation of specie, by any foreign ship or vessel, by section 5th, of the first supplementary act.

The exceptions to these prohibitions are: 1st. Vessels under the immediate direction of the president of the United States. 2d. Foreign ships or vessels, either in ballast, or with goods, wares and merchandise on board, when notified of the first act. 3d. Armed vessels, possessing public commissions, from any foreign power, not including in this description, privateers, letters of marque, or other private armed vessels. 4th. Vessels licensed for the fisheries, or bound on a whaling voyage, with no other cargo than sea stores, salt, and the usual fishing tackling and apparel. 5th. Vessels dispatched in ballast, under permission from the president of the United States, to import, from abroad, property from any citizen, which was actually without the jurisdiction of the United States, prior to the 22d December, 1807. The remaining provisions, in the several acts, are merely auxiliary, and appear intended more effectually to ensure the execution of the primary prohibitions. The first act is without limitation, and the several supplementary acts are to exist, during the continuance of the first. A separate act, passed April 22d, 1808 [2 Stat. 490], authorises the president of the United States to suspend the operation of the act laying an embargo, and the several supplementary acts, "in the event of such peace, or suspension of hostilities, between the belligerent powers of Europe, or of any changes in their measures, affecting neutral commerce, as may render that of the United States safe, in the judgment of the president"—with a proviso, that such suspension shall not extend beyond twenty days, after the next meeting of congress.

My views of the constitutional question, which has been raised in this case, will be confined to the acts relative to navigation, and to exportation by sea. On those, only, do the cases before the court depend; and it is obviously incumbent on a judge to confine himself to the actual case, presented for trial, and its inseparable incidents, and to avoid pronouncing premature decisions on extraneous questions. The prohibition of exportation by land, can, properly, come into view, only as it may tend to explain those provisions, on which I am called to decide, and to indicate their character. In the whole course of the interesting argument on this great question, and in all my reflections upon the subject, I have been deeply sensible of the solemn weight and magnitude of the inquiry. The unusual press of business, at this term, and the application of the recent acts to the numerous cases presented for trial, must have given full occupation to the mind, if supposed to be solicitous for a correct discharge of duty; and I could have wished, that this paramount question of constitutionality, when gentlemen had determined to rely on it, should have been reserved for the higher tribunals of the nation. But, on this subject, it was not for me to choose. A comparison of the law with the constitution is the right of the citizen. Those who deny this right, and the duty of the court resulting from it, must regard with strange indifference, a precious security to the individual, and have studied, to little profit, the peculiar genius and structure of our limited government.

Objections to an act of congress, on the ground of constitutionality, may be referred to the following heads: (1) A repugnancy to some of the exceptions or restrictions to the legislative authority, expressed in the constitution of the United States. (2) A repugnancy to some of the affirmative provisions, in

the constitution. (3) A want of conformity to the powers vested in the legislature, by the constitution; or that the act in question is not authorised by any of those powers.

As an instance under the first head, we may suppose an act, contravening the restrictive clause in the constitution, "No bill of attainder or ex post facto law shall be passed." An act repugnant to the declaration that, "the trial of all crimes, except in cases of impeachment, shall be by jury," would afford an example under the second head. Contraventions of this description, when clearly described and determined, could be of no legal effect; and it would appear to be the duty of the national courts, conformably to their specified authority by the constitution, and pursuant to the oath of office, to regard the acts, containing such repugnancies, to be so far void. It does not appear, nor is it, as I recollect, contended, that the acts under consideration, are liable to objections of this description. They contravene none of the exceptions or restrictions, expressed in the constitution, nor is it made to appear, that they are repugnant to any of its affirmative declarations. At least, this is true of the primary provisions. If any of the auxiliary regulations, in the supplementary acts, applying to the coasting trade, are liable to objections of this nature, they will be separately considered. Some of those regulations, it is argued, contravene that restriction on the powers of congress, which provides, that "vessels bound to, or from, one state, shall not be obliged to enter, clear, or pay duties in another." If this objection be available, it equally applies to the regulations in the coasting act, early adopted after the organization of the government; and which have since been in uniform operation, without meeting an objection of this sort. There is a degree of ambiguity in the expression, which seems to countenance the construction suggested in the argument; but the true construction avoids the objection. It was intended, as I understand it, to prevent vessels bound to, or from, a port, in any state, being obliged to enter, clear, or pay duties in any state, other than that, to, or from which, they should be proceeding. One of the amendments proposed by the state of North Carolina, suggests the following substitute for the clause we are now considering. "Nor shall vessels, bound to a particular state, be obliged to enter or pay duties in any other; nor, when bound from any one of the states, be obliged to clear in another." This reading would give a clearer expression of, what must be considered, the true meaning of the clause as it now stands. The objections, on the ground of unconstitutionality, to the acts in question, are thus limited to the third head; a defect of constitutional power, in the congress of the United States, to enact them. On this ground has the argument proceeded, and it is contended, that congress have not

power or authority, by the constitution of the United States thus to interdict commercial intercourse with foreign nations. On this head, a preliminary inquiry, of material importance, presents [itself]: What is the power or authority of the court, relative to an objection of this description? Or, in other words, is a mere exceeding of the powers of congress, in legislation, without a repugnancy to express provisions of the constitution, among the proper objects of cognizance in the federal judiciary?

In the consideration of this preliminary question, I shall first recur to judicial determinations and opinions for light and guidance. In the year 1792, congress passed an act, relative to the claims of invalids, for pensions. which required the intervention, in a qualified manner, of the circuit courts. [1 Stat. 243.] The judges of three of the circuit courts declined the execution of the act, and assigned their reasons, to the president of the United States. The objections were, that the business, assigned to the courts by the act, was not of a judicial nature; and that their judgments, or opinions, (which they considered as judgments) were, by the act, subjected to revision and controul by the legislature, and by an officer of the executive department. Though they declined acting as courts under the act, they expressed a willingness, for the accommodation of applicants, to consider themselves as commissioners; but congress, at a subsequent session, repealed the objectionable clauses, and made other provision, for determining the claims of applicants for pensions. [Hayburn's Case] 2 Dall. [2 U. S.] 410. In the case of Vanhorne's Lessee v. Dorrance [Case No. 16,857], in the circuit court of Pennsylvania, April term 1795, Judge Paterson pronounced an act of Pennsylvania, called, the "Quieting and Confirming Act," to be null and void, as repugnant to the constitution of that state. In the supreme court of the United States, February term, 1796, in the case of Hylton v. U. S. [3 Dall. (3 U. S.) 171], the constitutionality of the act, "laying duties on carriages," was discussed and determined. The point, in controversy, depended on the meaning of the terms "direct tax," in the constitution. It was contended, by the counsel for the plaintiff in error, that the tax on carriages was a direct tax, and, not being laid according to the census, as direct taxes are, by the constitution, required to be laid, that the law was void. The court were, unanimously, of opinion, that the tax on carriages was not a direct tax; of course, the question of the validity of an act, repugnant to an express clause in the constitution, was not determined. Judge Paterson, however, gave his opinion, on this point. "If it be a direct tax, it is unconstitutional; because it has been laid pursuant to the rule of uniformity, and not to the rule of apportionment." Judge Chase observed: "As I do not think the tax on

carriages is a direct tax, it is unnecessary, at this time, for me to determine, whether the court constitutionally possesses the power to declare an act of congress void, on the ground of its being made contrary to, or in violation of the constitution; but if the court have such power, I am free to declare, that I will never exercise it but in a very clear case." Justices Iredell, Wilson and Cushing all concurred with their associates, that the tax on carriages was not a direct tax, but gave no intimation of their opinions, if it had been of that denomination. [Hylton v. U. S.] 3 Dall. [3 U. S.] 171. In the same court, August term, 1798, in the action Calder v. Bull, Id. 386, the question was, as to the validity of an act of the legislature of Connecticut, setting aside a decree of a court of probate, and granting a new hearing. It was contended, that it was an ex post facto law, and, as such, prohibited by the constitution of the United States. The court were of opinion, that the law in question was not an ex post facto law, and, of course, there was no contravention of the constitution. Judge Chase avoided giving an opinion, whether the court had jurisdiction to decide, that any law made by congress, contrary to the constitution of the United States, be void. Judge Iredell was more explicit. "It has been the policy," said he, "of all the American states, which have individually framed their state constitutions, since the Revolution, and of the people of the United States, when they framed the federal constitution, to define, with precision, the objects of the legislative power, and to restrain its exercise, within marked and settled boundaries. If any act of congress, or of the legislature of a state, violates those constitutional provisions, it is unquestionably void; though, I admit, that, as the authority to declare it void, is of a delicate and awful nature, the court will never resort to that authority, but in a clear and urgent case." The last case, which I shall cite, is U. S. v. Callender [Case No. 14,709], in the circuit court in Virginia, May term, 1800, on the additional act "for the punishment of certain crimes against the United States," commonly called the sedition law. The counsel for the traverser offered to argue to the jury, that the law was unconstitutional. In overruling this motion, and in assigning his reasons, Judge Chase made the following observations, which appear to be pertinent to the present inquiry: "No citizen of knowledge and information, unless under the influence of passion or prejudice, will believe, without very strong and indubitable proof, that congress will, intentionally, make any known violation of the federal constitution and their sacred trust. I admit, that the constitution contemplates that congress may, from inattention, or error in judgment, pass a law prohibited by the constitution, and, therefore, it has provided a peaceable, safe, and adequate remedy. If such a case

should happen, the mode of redress is pointed out in the constitution, and no other mode can be adopted, without a manifest infraction of it. Every man must admit, that the power of deciding the constitutionality of any law of the United States, (or of any particular state) is one of the greatest and most important powers the people could grant. Such power is restrictive of the legislative power of the Union, and also of the several states, not absolute and unlimited, but confined to such cases only, where the law in question shall clearly appear to have been prohibited by the federal constitution, and not in any doubtful case." The immediate question that the learned judge was then considering, was, whether the power of determining the constitutionality of the law belonged, exclusively, to the court, or whether it could be rightfully exercised by a jury. His remaining observations, appearing in the published account of the trial, more especially apply to that question.

None of these cases decide the point now under consideration. By one of them, we have a decision against a state law, produced as a ground of title, as being repugnant to the constitution of the state. In another, we have the opinion of Judge Paterson, that a law of the United States, would, upon a certain construction, be repugnant to the constitution, and void. In the Connecticut case, we have Judge Iredell's opinion, that an act of congress, or of the legislature of any state, may be declared void by the court, if it violate constitutional provisions. Judge Chase, in these cases, speaks with great caution, on this head, it not being necessary to decide the point. In Callender's trial he is more explicit; and I understand him to admit the power of the court to disregard a statute, repugnant to the restrictions, in the constitution, on the authority of congress, and on that of the state legislatures. In none of the cases have we a decision, nor an opinion, as to the power of the court, where the objection to a statute is grounded, not on a repugnancy to express provisions, but on a supposed undue extension of a given power. The first case is of a peculiar nature, and no conclusive inference can be drawn from it, of the opinion of the court, relative to the point now under consideration. The law was not declared void, but the court declined acting upon it, except in a qualified manner, as commissioners. Their views and determinations on the subject, have reference to the nature of the judicial authority, and to the preservation of their constitutional independency, against encroachment.[1]

---

[1] Since this opinion was pronounced, it has been perceived, that two other cases should have been noticed, both of them in affirmance of the general doctrine, exhibited in the cases cited in the text.

Cooper v. Telfair. 4 Dall. [4 U. S.] 14. This case was in the supreme court of the United States, February term, 1800, in error, from the

Finding no direct judicial authority on the point, I shall next adduce opinions and reasonings from a less authoritative source, but still highly respectable. It is observed, by an eminent juridical writer, that "the scrupulous dignity of the law of England has not been accustomed to receive as authorities, any thing less than the opinions delivered by judges on the bench." (Reeves, Shipp.) This is doubtless a discreet and laudable reserve; and, most commonly, a strict adherence to the rule would still leave open to the inquirer, abundant means for a correct and satisfactory conclusion. But, in a case of

circuit court for the district of Georgia. An act of attainder and confiscation of the state of Georgia, passed May, 1782, was pleaded in bar of the plaintiff's demand. In the replication, were set forth several articles of the constitution of that state. one of which requires, that "all matters of breach of the peace, felony, murder and treason against the state" shall be tried in the county where the crime may have been committed. The other articles, specified in the replication, relate to the separation of the legislative, executive and judiciary departments—the principles of the habeas corpus act—freedom of the press—trial by jury—and the confinement of the legislature, in making laws, to such, as should not be repugnant to the true intent and meaning of any rule or regulation, contained in the constitution. It was contended, that the act of attainder and confiscation was repugnant to the constitution of Georgia, and void. The court were unanimously of opinion, that the act was not repugnant to the constitution. and affirmed the judgment of the circuit court. which was for the defendant, who was sued on the confiscated demand. Washington, J., observed: "The constitution of Georgia, does not expressly interdict the passing of an act of attainder and confiscation, by the authority of the legislature."—"If the plaintiff in error had shown that the offence, with which he was charged, had been committed in any county of Georgia. he might have raised the question of conflict and collision between the constitution and the law: but, as that fact does not appear, there is no ground, on which I could be prepared to say, that the law is void. The presumption, indeed, must always be in favour of the validity of laws. if the contrary is not clearly demonstrated. Judge Chase was of the same opinion, and for the same reason. He intimates, at the same time, his opinion of the validity of the law, on other grounds, and expresses a doubt, whether the power of the court, to declare an act void, can be employed to invalidate laws, enacted previous to the existence of the constitution of the United States. Judges Paterson and Cushing considered the act within the power of the legislature. there being no express provision in the constitution, devesting or transferring it: and the offender being beyond the reach of judicial process. when the law was enacted. "The constitutions of several of the other states," said Judge Paterson, "contain the same general principles and restrictions; but it was never imagined that they applied to a case like the present; and, to authorize this court to pronounce any law void. it must be a clear and unequivocal breach of the constitution. not a doubtful and argumentative implication."

In Marbury v. Madison. in the same court, February, 1803, the act of congress, authorising the supreme court to issue writs of mandamus, was considered as void. so far as it was repugnant to the specification of cases in the constitution, to which the original jurisdiction of that court is limited. The illustrative cases. supposed by the court. in their opinion, as pronounced by Chief Justice Marshall, are of similar description. 1 Cranch [5 U. S.] 137.

this description, out of the ordinary range of legal discussion, we are compelled to resort to other sources; and the counsel on both sides have found it necessary, or convenient, to derive confirmation or illustration of their positions, from books and treatises, seldom seen or mentioned at the bar. The work to which I shall refer, is that admirable commentary on the constitution of the United States, intitled, "The Federalist," the author of which is pronounced by one of our learned judges, to be superior to Blackstone, or his successor Woodeson, for extensive and accurate knowledge of the true principles of government.[2] If we love and cherish that constitution, we shall highly esteem this excellent commentary on that precious instrument. If that great political temple command our admiration. we shall follow, with improvement and delight, this luminous guide, through all its fair apartments. In the eighty-third number, after observing, that the power of congress extends only to certain enumerated cases, and, that this specification excludes all pretensions to general legislative power, or authority, the writer proceeds: "In like manner, the judicial authority of the federal judicatures is declared, by the constitution, to comprehend cases particularly specified. The expression of those cases marks the precise limits, beyond which the federal courts cannot extend their jurisdiction; because, the objects of their cognizance being enumerated, the specification would be nugatory, if it did not exclude all ideas of more extensive authority." In the seventy-eighth number, we have a more distinct exhibition of the author's views of a limited government, and of the power and office of the judiciary branch to secure it. "By a limited government, I understand one, which contains certain specified exceptions to the legislative authority; such, for instance, as that it shall pass no bills of attainder, no ex post facto laws, and the like. Limitations of this kind can be preserved in practice, no other way than through the medium of the courts of justice, whose duty it must be, to declare all acts, contrary to the manifest tenour of the constitution, void. Without this, all the reservation of particular rights or privileges would amount to nothing." We then have an interesting discussion on the necessity and foundation of this portion of judicial authority; it is illustrated by the usual exercise of judicial discretion, in discriminating between two contradictory laws, and a pertinent distinction is suggested, applicable to a supposed contravention of a constitutional provision. "Between the interfering acts of an equal authority, that, which was the last indication of its will, should have the preference. But, in regard to the interfering acts of a superior and sub-

[2] Judge Chase [Calder v. Bull] 3 Dall. [3 U. S.] 391. "The Federalist" has frequently, in other instances. been quoted with respect, in the courts of the United States.

ordinate authority, of an original and derivative power, the nature and reason of the thing indicate the converse of that rule. as proper to be followed. They teach us, that the prior act of a superior ought to be preferred to the subsequent act of an inferior and subordinate authority; and, that, accordingly, whenever a particular statute contravenes the constitution, it will be the duty of the judicial tribunals to adhere to the latter. and disregard the former. It can be of no weight to say, that the courts, on the pretence of a repugnancy, may substitute their own pleasure, to the constitutional intentions of the legislature. This might as well happen in the case of two contradictory statutes; or it might as well happen, in every adjudication upon a single statute." In the eighty-first number, when replying to arguments, or suggestions, against the judiciary, from their supposed power of construing the laws according to the spirit of the constitution, it is said; "this, upon examination, will be found to be altogether made up of false reasoning, from misconceived fact. In the first place, there is not a syllable in the plan, under consideration, which directly empowers the national courts, to construe the laws according to the spirit of the constitution; or, which gives them any greater latitude in this respect, than may be claimed by the courts of every state. I admit, however, that the constitution ought to be the standard of construction for the laws; and that, whenever there is an evident opposition, the laws ought to give place to the constitution." In the eightieth number, which exhibits a view of the judicial department, in relation to the extent of its powers, the general position is, that "there ought always to be a constitutional method of giving efficacy to constitutional provisions." Having laid down the principles, proper for the regulation of the federal judiciary, the writer proceeds to test, by those principles, the particular powers given to the judiciary, by the constitution. He then recites the first paragraph of the second section, of the third article, as constituting the entire mass of the judicial authority of the Union. Viewing it then, in detail, he proceeds to comment on the first part of the paragraph: "The judicial power shall extend to all cases in law and equity arising, under this constitution [and] the laws of the United States." "It has been asked," he observes, "what is meant by cases arising under the constitution, in contradistinction from those arising under the laws of the United States?" "The difference," he adds, "has been already explained. All the restrictions upon the authority of state legis-latures furnish examples. They are not, for instance, to emit paper money; but the interdiction results from the constitution, and will have no connexion with any law of the United States. Should paper money, notwithstanding, be emitted, the controversies concerning it would be cases arising under the constitution, and not upon the laws of the United States. in the ordinary signification of the terms. This may serve as a sample of the whole."

These extracts give a clear and satisfactory view of the opinions entertained by the writer, or writers, of those papers. on this topic; and it is evident, that the judicial authority, is, in their estimation, precisely limited, in regard to deciding on the validity of legislative acts; and that the power to declare them void exists, only, in cases of contravention, opposition or repugnancy, to some express restrictions or provisions contained in the constitution. The examples and the argument apply only to cases of legislative action, which their powers forbid; not to those, which their powers may be supposed not to authorize. This is further manifest from observations, variously interspersed, in those writings, relative to a supposed abuse or exceeding of powers, by the legislature; or, in other words, to an act of usurpation. In the first place, there is a strong conviction expressed, that no such case can or will occur, in a government so organized, and where such strong sympathies will exist, between the representatives and their constituents. That the government is in the hands of the representatives of the people, is pronounced to be, "the essential and only efficacious security for the rights and privileges of the people, which is attainable in civil society." But, should usurpation rear its head; should the unnatural case ever occur, when the representatives of the people should betray their constituents, we are referred, for consolation and remedy, to the power and vigilance of the state governments; to publick opinion; to the active agency of the people in their elections; to that perpetual dependence on the people, which is the primary controul on the government; "to the vigilant and manly spirit, which actuates the people of America, a spirit which nourishes freedom, and, in return, is nourished by it;" and, in case of desperate extremities, for which no system of government can provide, "to that original right of self-defence, which is paramount to all positive forms of government." In one passage, indeed, where the writer is speaking of the resort, in case of a supposed usurpation, we are referred to the judiciary and to the executive, as well as to the people, without any discrimination of the circumstances to which the different sources of remedy would be applicable. "In the first instance," says the writer, "the success of the usurpation will depend on the executive and judiciary departments, which are to expound and to give effect to the legislative acts; and, in the last resort, a remedy must be obtained from the people, who can, by the election of more faithful representatives, annul the acts of the usurpers." Volume 2, No. 44, p. 74. This passage may be so construed, as to be consistent with those

before cited; but, if irreconcilable, with the doctrines so clearly expressed in other places, we must account for any supposed diversity of sentiment, from the circumstance, that those valuable papers were not all from the same pen. Cases might be put, of acts, so manifestly without the sphere of objects, committed to the national government, that the judiciary branch might be competent to pronounce them invalid, not as repugnant to any particular clause of the constitution, but to its whole expressed design and tenour. "The propriety of a law," says the writer, "so frequently quoted, must always be determined by the nature of the powers upon which it is founded. Suppose, by some forced construction of its authority (which indeed cannot be easily imagined) the federal legislature should attempt to vary the law of descent in any state; would it not be evident, that, in making such an attempt, it had exceeded its jurisdiction, and infringed upon that of the state?" Here would be an obvious assumption of a new power, not to be found in the constitution, and it is distinguishable from an improper exercise, or undue extension, of a power given. "The national government. like every other," adds the writer, "must judge in the first instance, of the proper exercise of its powers, and its constituents, in the last. If the federal government should overpass the just bound of its authority, and make a tyrannical use of its powers, the people, whose creature it is, must appeal to the standard they have formed, and take such measures, to redress the injury done to the constitution, as the exigency may suggest, and prudence justify." Volume 1, No. 33, p. 203.

It is a recommendation of these views of the constitutional powers of the judiciary, relative to legislative acts, that they reduce it to that precision and certainty, which is so desirable, in reference to judicial deliberations; and avoid those manifest grounds or occasions of irreconcilable collision, between the judiciary and legislative departments, which might otherwise prevail. Affirmative provisions and express restrictions, contained in the constitution, are sufficiently definite to render decisions, probably in all cases, satisfactory; and the interferences of the judiciary with the legislature, to use the language of the constitution, would be reduced to "cases." easily to be understood, and, in which the superior, commanding, will of the people, who established the instrument, would be clearly and peremptorily expressed. To extend this censorial power further, and especially to extend it to the degree, contended for in the objections to the act now under consideration, would be found extremely difficult, if not impracticable, in execution. To determine where the legitimate exercise of discretion ends, and usurpation begins, would be a task most delicate and arduous. It would, in many instances, be extremely difficult to settle it, even in a

single body. It would be much more so, if to be adjusted by two independent bodies. especially if those bodies, from the nature of their constitution, must proceed by different rules. Before a court can determine, whether a given act of congress, bearing relation to a power with which it is vested. be a legitimate exercise of that power, or transcend it, the degree of legislative discretion, admissible in the case, must first be determined. Legal discretion is limited. It is thus defined by lord Coke, "Discretio est discernere, per legem, quid sit justum." Political discretion has a far wider range. It embraces, combines and considers, all circumstances, events and projects, foreign or domestick, that can affect the national interests. Legal discretion has not the means of ascertaining the grounds, on which political discretion may have proceeded. It seems admitted, that necessity might justify the acts in question. But how shall legal discussion determine, that political discretion, surveying the vast concerns committed to its trust, and the movements of conflicting nations, has not perceived such necessity to exist? Considerations of this nature have induced a doubt of the competency, or constitutional authority of the court, to decide an act invalid, in a case of this description. On the precise extent, however, of the power of the court, I do not give a definite opinion; my view of the main question, submitted by the counsel, in this case, rendered such a decision unnecessary. I now proceed to the examination of that question. It will be perceived, that some of the considerations, suggested under the last head, have an application to the remaining inquiry, and, it is acknowledged, that they had an influence in forming my determination.

It is contended, that congress is not invested with powers, by the constitution, to enact laws, so general and so unlimited, relative to commercial intercourse with foreign nations, as those now under consideration. It is well understood, that the depressed state of American commerce, and complete experience of the inefficacy of state regulations, to apply a remedy, were among the great, procuring causes of the federal constitution. It was manifest, that other objects, of equal importance, were exclusively proper for national jurisdiction; and that under national management and controul, alone, could they be advantageously and efficaciously conducted. The constitution specifies those objects. A national sovereignty is created. Not an unlimited sovereignty, but a sovereignty, as to the objects surrendered and specified, limited only by the qualifications and restrictions, expressed in the constitution. Commerce is one of those objects. The care, protection, management and controul, of this great national concern, is, in my opinion. vested by the constitution, in the congress of the Unit-

ed States; and their power is sovereign, relative to commercial intercourse, qualified by the limitations and restrictions, expressed in that instrument, and by the treaty making power of the president and senate. "Congress shall have power to regulate commerce with foreign nations, and among the several states, and with the Indian tribes." Such is the declaration in the constitution. Stress has been laid, in the argument, on the word "regulate," as implying, in itself, a limitation. Power to regulate, it is said, cannot be understood to give a power to annihilate. To this it may be replied, that the acts under consideration, though of very ample extent, do not operate as a prohibition of all foreign commerce. It will be admitted that partial prohibitions are authorized by the expression; and how shall the degree, or extent, of the prohibition be adjusted, but by the discretion of the national government, to whom the subject appears to be committed? Besides, if we insist on the exact and critical meaning of the word "regulate," we must, to be consistent, be equally critical with the substantial term, "commerce." The term does not necessarily include shipping or navigation; much less does it include the fisheries. Yet it never has been contended, that they are not the proper objects of national regulation; and several acts of congress have been made respecting them. It may be replied, that these are incidents to commerce, and intimately connected with it; and that congress, in legislating respecting them, act under the authority, given them by the constitution, to make all laws necessary and proper, for carrying into execution the enumerated powers. Let this be admitted; and are they not at liberty, also, to consider the present prohibitory system, as necessary and proper to an eventual beneficial regulation? I say nothing of the policy of the expedient. It is not within my province. But, on the abstract question of constitutional power, I see nothing to prohibit or restrain the measure.

Further, the power to regulate commerce is not to be confined to the adoption of measures, exclusively beneficial to commerce itself, or tending to its advancement; but, in our national system, as in all modern sovereignties, it is also to be considered as an instrument for other purposes of general policy and interest. The mode of its management is a consideration of great delicacy and importance; but, the national right, or power, under the constitution, to adapt regulations of commerce to other purposes, than the mere advancement of commerce, appears to me unquestionable. Great Britain is styled, eminently, a commercial nation; but commerce is, in fact, a subordinate branch of her national policy, compared with other objects. In ancient times, indeed, shipping and navigation were made subordinate to commerce, as then contemplated. The mart, or staple, of their principal productions, wool, leather and lead, was confined to certain great towns in the island, where foreigners might resort to purchase; and Englishmen were restrained from exporting those commodities, under heavy penalties. It was conceived, that trade thus conducted, would be more advantageous to the country, than if transacted by the English, on the continent. On this idea was made the statute of the staple. 27 Edw. III. (Vide Reeves' Hist. of English Law, 2, 393.) This may appear a strange regulation. It was evidently founded on erroneous views, and Selden, the learned commentator on Fortescue, remarks, "that all acts or attempts, which have been derogatory to trade, have ever been noted to be discouraged and short lived," in that nation. It is well known, how the views of their statesmen, and their commercial laws have changed, since that statute was enacted. The navigation system has long stood prominent. The interests of commerce are often made subservient to those of shipping and navigation. Maritime and naval strength is the great object of national solicitude; the grand and ultimate objects are the defence and security of the country. The situation of the United States, in ordinary times, might render legislative interferences, relative to commerce, less necessary; but the capacity and power of managing and directing it, for the advancement of great national purposes, seems an important ingredient of sovereignty. It was perceived, that, under the power of regulating commerce, congress would be authorized to abridge it, in favour of the great principles of humanity and justice. Hence the introduction of a clause, in the constitution, so framed, as to interdict a prohibition of the slave trade, until 1808. Massachusetts and New York proposed a stipulation, that should prevent the erection of commercial companies, with exclusive advantages. Virginia and North Carolina suggested an amendment, that "no navigation law, or law regulating commerce, should be passed, without the consent of two thirds of the members present, in both houses." These proposed amendments were not adopted, but they manifest the public conceptions, at the time, of the extent of the powers of congress, relative to commerce.

It has been said, in the argument, that the large commercial states, such as New York and Massachusetts, would never have consented to the grant of power, relative to commerce, if supposed capable of the extent now claimed. On this point, it is believed, there was no misunderstanding. The necessity of a competent national government was manifest. Its essential characteristics were considered and well understood; and all intelligent men perceived, that a power to advance and protect the national interests, necessarily involved a power, that might be abused. The Federalist, which was particularly addressed to the people of the state of New York, frankly avows the genuine operation of the powers, proposed to be vested in the general gov-

ernment. "If the circumstances of our country are such, as to demand a compound, instead of a simple, a confederate, instead of a sole, government, the essential point, which will remain to be adjusted, will be to discriminate the objects, as far as it can be done, which shall appertain to the different provinces, or departments, of power; allowing to each the most ample authority for fulfilling those, which may be committed to its charge. Shall the Union be constituted the guardian of the common safety? Are fleets, and armies, and revenues necessary for this purpose? The government of the Union must be empowered, to pass all laws, and to make all regulations which have relation to them. The same must be the case, in respect to commerce, · and to every other matter, to which its jurisdiction is permitted to extend." Volume 1. No. 23, p. 146.

If it be admitted that national regulations relative to commerce, may apply it as an instrument, and are not necessarily confined to its direct aid and advancement, the sphere of legislative discretion is, of course, more widely extended; and, in time of war, or of great impending peril, it must take a still more expanded range. Congress has ·power to declare war. It, of course, has power to prepare for war; and the time, the manner, and the measure, in the application of constitutional means, seem to be left to its wisdom and discretion. Foreign intercourse becomes, in such times, a subject of peculiar interest, and its regulation forms an obvious and essential branch of the federal administration. In the year 1798, when aggressions from France became insupportable, a non-intercourse law, relative to that nation and her dependencies, was enacted; partial hostilities, for a time, prevailed; but no war was declared. I have never understood, that the power of congress to adopt that course of proceeding was questioned. It seems to have been admitted, in the argument, that state necessity might justify a limited embargo, or sus-. pension of all foreign. commerce; but if congress have the power, for purposes of safety, of preparation, or counteraction, to suspend commercial intercourse with foreign nations, where do we find them limited as to the duration, more than as to the manner and extent of the measure? Must we understand the nation as saying to their government: "We look to you for protection and security, against all foreign aggressions. For this purpose, we give you the controul of commerce; but, you shall always limit the time, during which this instrument is to be used. This shield of defence you may, on emergent occasions, employ; but you shall always announce to us and to the world, the moment when it shall drop from your hands."

It is apparent, that cases may occur, in which the indefinite character of a law, as to its termination, may be essential to its efficacious operation. In this connexion, I would notice the internal indications, exhibited by the acts themselves, relative to their duration. In addition to the authority given to the president to suspend the acts, upon the contingency of certain events, we have evidence, from the very nature of their provisions, that they cannot be designed to be perpetual. An entire prohibition of exportation, unaccompanied with any restriction on importations, could never be intended for a permanent system; though the laws, in a technical view, may be denominated perpetual, containing no specification of the time when they shall expire. In illustration of their argument, gentlemen have supposed a strong case; a prohibition of the future cultivation of corn, in the United States. It would not be admitted, I presume, that an act, so extravagant, would be constitutional, though not perpetual, but confined to a single season. And why? Because it would be, most manifestly, without the limits of the federal jurisdiction, and relative to an object, or concern, not committed to its management. If an embargo, or suspension of commerce, of any description, be within the powers of congress, the terms and modifications of the measure must also be within their discretion. If the measure be referred to state necessity, the body that is authorized to determine on the existence of such necessity, must, also, be competent so to modify the means, as to adapt them to the exigency. It is said, that such a. law is in contravention of ·unalienable rights; and we have had quotations from elementary writers, and from the bills of rights of the state constitutions, in support of this position. The doctrines and declarations of those respectable writers, and in those venerable instruments, are not to be slighted; but we are to leave the wide field of general reasonings and abstract principles, and are to consider the construction and operation of an express compact, a government of convention. The general position is incontestible, that all that is not surrendered by the constitution, is retained. The amendment which expresses this, is for greater security; but such would have been the true construction, without the amendment. Still, it remains to be determined, and it is often a question of some difficulty, what is given? By the second article of the confederation, congress were prohibited the exercise of any power not expressly delegated. A similar qualification was suggested, in one of the amendments proposed by the state of New-Hampshire, to the new constitution. The phraseology, indeed, was strengthened; and congress were to be prohibited from the exercise of powers, not expressly and particularly delegated. Such expressions .were not adopted. If they had been, as an intelligent writer justly observes, "Congress would be continually exposed, as their predecessors, under the confederation, were, to the alternative of construing the term, expressly, with so much rigour, as to disarm the government of all real authority whatever; or, with so much latitude, as to destroy, altogether the force of the restriction." It is wisely left as it is; and the true sense

and meaning of the instrument is to be determined by just construction, guided and governed by good sense and honest intentions. Under the confederation, congress could have no agency relative to foreign commerce, but through the medium of treaties; and, by the ninth article, it was stipulated, that no treaty of commerce should be made, whereby the legislative power of the respective states, should be restrained, from imposing such imposts and duties on foreigners, as their own people were subjected to, "or from prohibiting the exportation of any species of goods or commodities whatsoever." Here we find an express reservation to the state legislatures of the power to pass prohibitory commercial laws, and, as respects exportations, without any limitations. Some of them exercised this power. In Massachusetts, it was carried to considerable extent, with marked determination, but to no sensible good effect. One of the prohibitory acts of that state, passed in 1786, was for the express "encouragement of the agriculture and manufactures in our own country." The other, which was a counteracting law, had no definite limitation, but was to continue in force, until congress should be vested with competent powers, and should have passed an ordinance for the regulation of the commerce of the states. Unless congress, by the constitution, possess the power in question, it still exists in the state legislatures—but this has never been claimed or pretended, since the adoption of the federal constitution; and the exercise of such a power by the states, would be manifestly inconsistent with the power, vested by the people in congress, "to regulate commerce." Hence I infer, that the power, reserved to the states by the articles of confederation, is surrendered to congress, by the constitution; unless we suppose, that, by some strange process, it has been merged or extinguished, and now exists no where.

The propriety of this power, on the present construction, may be further evinced, by contemplating the operation of specific limitations or restrictions, which it might be proposed to apply. Will it be said, that the amendment, proposed by Virginia and North-Carolina, would be an improvement in the instrument of government? Such a provision might prevent the adoption of exceptionable regulations; but, it would be equally operative in defeating those that would be salutary; and would disable the majority of the nation from deciding on the best means of advancing its prosperity. To avoid such a system, as is now in operation, shall the people expressly provide, as a limitation to the power of regulating commerce, that it shall not extend to a total prohibition; or but for a limited time? Nothing would be gained by such restrictions. A prohibition might still be so nearly total, or extend to such a length of time, without violation of the restriction, as to be equivalent, in practical effect, to the present arrangement. Or will it be said, that

the judiciary should then be called upon to decide the law void, though not repugnant to the terms of the restriction, and to consider exceptions from the prohibition, as, in the common case of a fraudulent deed, to be merely colourable? Loose and general restrictions would be ineffective, or, at best, merely directory. If particular and precise, they would evince an indiscreet attempt to anticipate the immense extent and variety of national exigencies, and would not be suitable appendages to a power, which, in its exercise, must depend on contingencies, and, from its nature and object, must be general. A particular mischief or inconvenience, contemplated in framing such limitations, might be avoided; but they would also injuriously fetter the national councils, and prevent the application of adequate provisions for the publick safety and happiness, according to the ever varying emergencies of national affairs. Let us not insist on a security, which the nature of human concerns will not permit. More effectual guards against abuse, more complete security for civil and political liberty, and for private right, are not, perhaps, afforded to any nation than to the people of the United States. These views of the national powers are not new. I have only given a more distinct exhibition of habitual impressions, coeval, in my mind, with the constitution. Upon these considerations, I am bound to overrule the objections to the acts in question, which I shall proceed to apply to the cases before the court, believing them to be constitutional laws.

I lament the privations, the interruption of profitable pursuits and manly enterprize, to which it has been thought necessary to subject the citizens of this great community. I respect the merchant and his employment. The disconcerted mariner demands our sympathy. The sound of the axe, and of the hammer, would be grateful music. Ocean, in itself a dreary waste, by the swelling sail and floating steamer, becomes an exhilarating object; and it is painful to perceive, by force of any contingencies, the American stars and stripes vanishing from the scene. Commerce, indeed, merits all the eulogy, which we have heard so eloquently pronounced, at the bar. It is the welcome attendant of civilized man, in all his various stations. It is the nurse of arts; the genial friend of liberty, justice and order; the sure source of national wealth and greatness; the promoter of moral and intellectual improvement; of generous affections and enlarged philanthropy. Connecting seas, flowing rivers, and capacious havens, equally with the fertile bosom of the earth, suggest, to the reflecting mind, the purposes of a beneficent Deity, relative to the destination and employments of man. Let us not entertain the gloomy apprehension, that advantages, so precious, are altogether abandoned; that pursuits, so interesting and beneficial, are not to be resumed. Let us rather cherish a

hope, that commercial activity and intercourse, with all their wholesome energies will be revived; and, that our merchants and our mariners will, again, be permitted to pursue their wonted employments, consistently with the national safety, honour and independence!